# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 14, 2008 Session

## STATE OF TENNESSEE v. WENDI NICOLE GARRISON

### Direct Appeal from the Criminal Court for Carter County
No. S17724     Lynn W. Brown, Judge

---

### No. E2007-02895-CCA-R3-CD - Filed August 14, 2009

---

The defendant, Wendi Nicole Garrison, was found guilty as charged of second degree murder, a Class A felony, and was sentenced to sixteen years as a violent offender. On appeal, she argues that: the evidence was insufficient to support her conviction; the trial court erred in failing to charge the lesser included offense of voluntary manslaughter; and the trial court erred in denying a new trial based on the composition of the jury. After careful review, we find that plain error exists in the omission of jury instruction for the lesser included offense of voluntary manslaughter. We are, therefore, compelled to remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded for New Trial

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Stacy L. Street, Elizabethton, Tennessee, and James T. Bowman, Johnson City, Tennessee, for the appellant, Wendi Nicole Garrison.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; and Al Schmutzer, District Attorney General Pro Tem, for the appellee, State of Tennessee.

### OPINION

This case involves the murder of Joshua Perry, the victim, from a single gunshot wound to the head from a muzzle loader fired at close range. Testimony elicited at trial demonstrated that the defendant and victim had lived together for eight to nine months at various residences and that they had a history of violent altercations. The victim had previously beaten the defendant, and, as a result, the victim was arrested and charged with domestic violence. The defendant sought an order of protection against the victim but later withdrew her request for the order. Further, she failed to appear at court for the assault case against the victim. During the parties' relationship, the victim

was married to another woman. The victim and defendant lived together at the time of his death. The parties attempted to have a baby, but the defendant miscarried in February 2005.

At trial, the landlord for the defendant and the victim testified that at approximately 6:15 a.m. on March 25, 2007, the defendant came to her door crying and stating that she shot the victim. The landlord suggested that they call 9-1-1, but the defendant told her the victim was already dead. She testified that the defendant's pants appeared to have vomit on them. The landlord called 9-1-1 and the defendant can be heard talking to the first responders in the background of the recording.

The 9-1-1 recording was played for the jury. In the recording, the defendant can be heard to say, "Joshua is dead" and "I killed him." The 9-1-1 operator asked why the defendant shot the victim, and the defendant responded that the victim told her to pull the trigger. She stated she told the victim that he was an "asshole" and then pulled the trigger. The defendant repeatedly said that she pulled the trigger only after the victim told her to do so. The defendant told the operator that there was brain matter everywhere. The defendant also acknowledged that they had been drinking. The defendant said that the victim told her the only way she would leave the house would be if he was dead.

A special agent with the Tennessee Bureau of Investigation testified that the defendant asked her to check the victim's hands for residue because she believed he helped to pull the trigger. The defendant told him they were fighting and the trigger was pulled. He also testified that the bag containing the muzzle loader supplies was clutched in the victim's right hand when his body was found.

An autopsy was performed on the victim's body. The victim died as a direct result of a massive gunshot wound to the head with massive destruction to the head and evulsion of the brain. The gunshot wound was demonstrated to be a contact or near contact wound. The victim also sustained fresh scratches on the side of his neck that were consistent with fingernail scratches. There was a prominent bruise on the back of the knuckle of the little finger of the victim's right hand that appeared to be a bruise from hitting an object, person, floor, or table. The victim had a heavy brownish black circle around the thumb and base of the first finger of his left hand, consistent with soot from gunpowder residue. Autopsy photographs also show this residue.

Special Agent James Russell Davis of the Tennessee Bureau of Investigation testified that he performed a test firing of the murder weapon to determine if the weapon would emit gunshot residue and be collected on the hands that were near the trigger or port of the weapon. His test resulted in a finding that the shooter would have gunshot residue on his/her hands sufficient to have fired the weapon. The findings of the test were consistent with the results of the tests performed on the victim's hands. He also testified that the results of the gunshot residue kit performed on the defendant were found to be inconclusive.

The defendant testified at trial that she went shopping on the day of the murder to purchase the victim an Easter basket and beer to consume with their dinner. The defendant testified that she

returned from her errands around 9:15 p.m. She said that this would be a special night for them because their schedules usually did not permit them to have dinner together. The defendant said she prepared dinner, took a shower, got dressed, and applied make-up. She testified that she constructed a fire and took photographs of the fire because the victim did not think she was capable of doing so. She identified the living room of their residence depicting the scene prior to the victim's arrival, based on the photographs she produced. The photograph showed the murder weapon in the corner of the living room.

The defendant said the victim arrived home at approximately 11:40 p.m., carrying a six-pack of pony beers. He was drinking a beer when he entered the residence. The defendant and victim watched television for a while, danced in front of the fireplace to a song, and decided to go to the local Wal-Mart to purchase movies to watch that night. They purchased more beer, and the defendant testified that they were having a great time with no problems or fights. They returned around 2:00 a.m. on the morning of March 25, 2005, showered, and watched a movie until 4:00 a.m. The defendant said that while they watched the movie, they began arguing about the movie.

The defendant said she went to the bathroom, and the victim asked her if she wanted to try and have another baby. She did not want to talk about it, and the victim confronted her angrily by cursing her and telling her it was all her fault that she lost the baby. She testified that she hit the victim and ran to their bedroom. The victim followed her, sat on the edge of the bed, and inquired if they were going to have sex. The defendant told him that she would not have sex with the victim because of his comments.

The defendant testified that she ran from the victim but he grabbed her by her hair, pulled her down, and hit her head against the floor. The defendant said she hit the victim and reminded him that he said he would never do this to her again. She said that he continued to bang her head against the floor as he had done in a prior assault. The defendant said she tried to push the victim off of her but he took her hands and put them around his neck. The victim asked her to kill him with her hands. She was able to get free of the victim, grab her keys, and open the front door. The victim caught her, took the keys, and led her to the living room by pulling her hair. The defendant said she grabbed her cell phone to call 9-1-1. The victim took the phone and threw it into the fireplace.

The defendant said the victim calmed down and stopped yelling at her and hitting her. The defendant testified that she asked to leave and told the victim everything would be okay. The victim told her she was not leaving and would never be able to leave. She said that the victim walked over and picked up the muzzle loader that was near the fireplace. The victim loaded the gun and put the barrel against his forehead. The defendant testified that the victim told her to kill him. She said that she begged him to let her leave but he told her she would never come back if she left. The defendant said that she tried to talk to the victim but he was reaching for her hand while telling her to pull the trigger. She said that they struggled, she turned away, and the gun fired.

She said that she turned to see what had happened and that the victim was lying on the ground. Her testimony was that she did not believe the victim was shot and thought he was joking.

She said that she heard liquid running and realized it was blood from the victim's head. She ran next door, and the neighbor called 9-1-1.

The defendant was transported to jail where a gunshot residue kit was performed and found to be inconclusive. The defendant was taken to the hospital and examined for injuries. The attending physician noted that the defendant had bruises, a contusion and sprain to her right thumb, as well as bruising to her right forearm. She attributed these injuries to the assault.

Dr. Paulette Sutton was called by the defendant as an expert on blood splatter evidence. She testified that she reviewed the photographs and other discovery evidence. She opined that the gunshot went from the area of the loveseat toward the stairway to the second floor. At the time of the gunshot, the victim would have been standing with his back toward the stairway and in front of the loveseat. She testified that the defendant would have been three to four feet from the victim. Her opinion was consistent with the defendant's testimony.

Dr. Larry Miller testified for the defendant as an expert in crime scene analysis and firearms ballistics testing. He opined that the only plausible reconstruction would be that the muzzle of the gun was in contact with the victim's forehead while his left hand was near the vent port and trigger when it discharged. He testified that the victim's head would have been at an angle over the barrel of the weapon in order to produce the blast pattern as shown from the physical evidence.

The defendant was found guilty as charged of second degree murder.

During the sentencing hearing, the trial court accredited the testimony of the defendant's experts and found that their testimony was undisputed and accurately described the events leading up to the pulling of the trigger. The trial court found that the victim was responsible for retrieving the weapon, loading it, aiming it, and telling the defendant to pull the trigger. The State argued that the 9-1-1 tape was evidence that the crime was a knowing killing that justified the conviction for second degree murder. The defendant was sentenced to sixteen years in the Tennessee Department of Correction.

Analysis

On appeal, the defendant contends that the evidence was insufficient to support her conviction for second degree murder. Specifically, she contends that the evidence did not support a finding that she knowingly pulled the trigger because she was engaged in a struggle with the victim when he was shot.

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *Grace*, 493 S.W.2d at 476.

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1) (2006). As charged here, the "knowing" element requires that the defendant acted with an awareness that her conduct was reasonably certain to cause the death of the victim. On appeal, the defendant argues that her testimony supports the claim that the victim pulled the trigger. However, the tape recording of the 9-1-1 emergency phone call immediately following the murder demonstrates that the defendant pulled the trigger. On the tape recording, she admitted that she shot the victim. When asked why she shot the victim, she replied that he was an "asshole." She further replied that she pulled the trigger because the victim told her to pull the trigger. She also told a police officer that she and the victim were fighting and that she pulled the trigger.

The State submits that the case came down to whether the jury believed the defendant knowingly pulled the trigger. The evidence reflected that the defendant and the victim had a history of violence. During the 9-1-1 phone call immediately after the shooting, the defendant acknowledged that she pulled the trigger. These facts provide sufficient evidence to support the jury's finding that the defendant knew she pulled the trigger. The defendant is not entitled to relief on this issue.

Next, the defendant argues that the trial court committed plain error by declining to instruct the jury on the lesser included offense of voluntary manslaughter. The Tennessee Supreme Court held in *State v. Page*, 184 S.W.3d 223, 229-30 (Tenn. 2006), that the current version of Tennessee Code Annotated section 40-18-110(c) subjects the right to lesser included offense instructions to the

general rule that issues concerning incomplete instructions are deemed waived in the absence of an objection or special request. *Id*. at 230. *See also State v. Rice*, 184 S.W.3d 646, 676 (Tenn. 2006). While section 40-18-110(c) precludes a defendant who fails to request a lesser included offense instruction in writing from seeking plenary appellate review of the issue, an appellate court is not precluded from *sua sponte* reviewing the lesser included offense issue under the plain error doctrine. *State v. Page,* 184 S.W.3d at 230.

The trial court instructed the jury on the lesser included offenses of reckless homicide and criminally negligent homicide. During the sentencing hearing, the trial court found as a mitigating factor that the defendant acted under "strong provocation." The defendant argues that this was the first time the court used the word "provocation." The defendant contends that it was error for the trial court to fail to instruct on voluntary manslaughter after finding that "strong provocation" existed.

In this case, the defendant failed to request in writing an instruction on the lesser included offense of voluntary manslaughter and is therefore precluded under Tennessee Code Annotated section 40-18-110 from seeking plenary appellate review of the issue. We will look, however, to whether the trial court's failure to instruct on the lesser included offense of voluntary manslaughter was plain error.

An error which has affected the substantial right of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error" or "fundamental error" is recognized under Tennessee Rule of Criminal Procedure 52(b). *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).

There are five factors which must be present for a court to determine "plain error" exists:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *Adkisson*, 899 S.W.2d at 641-42). Complete consideration of all five factors is unnecessary if at least one is absent. *Id*. at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. *Adkisson*, 899 S.W.2d at 642.

Voluntary manslaughter is a lesser included offense of second degree murder under the test established in *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999). The issue is whether the evidence

presented at trial was sufficient to support an instruction for voluntary manslaughter. In *Burns*, the Tennessee Supreme Court held that there is a two-step test to determine whether an instruction on a lesser included offense is supported by the evidence. 6 S.W.3d at 469. First we must determine if any evidence exists that reasonable minds could accept as to the lesser included offense. Second, we must determine if the evidence, when viewed liberally in the light most favorable to the existence of a lesser included offense, is legally sufficient to support a conviction for the lesser included offense. *Id.*

Here, the defendant was convicted of second degree murder, a knowing killing under Tennessee Code Annotated section 39-13-210. Voluntary manslaughter is also a knowing killing but one committed "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner" under Tennessee Code Annotated section 39-13-211. In order for reasonable minds to find the defendant guilty of the lesser included offense of voluntary manslaughter, the jury would have to conclude that the victim provided the adequate provocation sufficient to make the defendant act in an irrational manner, i.e., to pull the trigger of a loaded gun that was held to the victim's forehead.

According to the defendant's own testimony, she and the victim had been fighting on the morning of the murder. She told the first responding officers that the murder weapon was hers and that she used it to hunt deer. The defendant was also heard multiple times on the 9-1-1 recording stating that she pulled the trigger. She also testified to a history of violence between herself and the victim, in addition to telling the officers that she had to kill the victim before she could leave the home. The victim had gunpowder residue on his hand consistent with the finding that the shooter would have powder on his hands. The tests for gunpowder residue on the defendant's hands were inconclusive. This evidence is susceptible to the following interpretations: (1) the defendant knowingly pulled the trigger because she was fighting with the victim and he had assaulted her on the morning of his death; (2) the defendant knowingly pulled the trigger to kill the victim but was provoked because he told her she could not leave without killing him; (3) the presence of gunpowder on the victim's hands indicates that he pulled the trigger; or (4) the victim supplied the force for the defendant's finger to pull the trigger while they struggled.

Two of the factual interpretations justify an instruction on voluntary manslaughter. For the omission of a jury instruction to rise to the level of plain error, the omission "would have to be especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d at 231.

At trial, the defendant failed to request a lesser included offense instruction on voluntary manslaughter. However, we conclude that the omission of the jury instruction rises to the level of plain error. The trial court instructed on two lesser included offenses but omitted voluntary manslaughter, a higher grade of lesser included offense. The evidence presented at trial was sufficient to support an instruction for voluntary manslaughter, and the omission of such instruction rises to the level of plain error. Therefore, we are compelled to remand to the trial court for a new

trial.

Next, the defendant argues that the trial court denied her the right to a fair and impartial jury comprised of a fair cross-section of the community. She argues that the trial court clerk mistakenly advised twenty potential jurors, through an automated call-in service, that their service was not necessary on the day of her voir dire. The State contends that the trial court, the defendant, and the State were all unaware of the mistake at the time of voir dire.

In *Taylor v. Louisiana*, the United States Supreme Court found that there was a "fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment." 419 U.S. 522, 530 95 S. Ct. 692, 698 (1975). However, the Court went on to state that there was no requirement that the petit jury must mirror the community and reflect the various distinctive groups in the population. "Defendants are not entitled to a jury of any particular composition." *Fay v. New York*, 332 U.S. 261, 284 (1947).

"[T]o establish a *prima facie* violation of the fair cross-section requirement, the defendant must show that: (1) the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusions of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 99 S. Ct. 664, 586-87 (1979). If the defendant has made a *prima facie* case, the government bears the burden of justifying the infringement by showing that the attainment of a fair cross-section is incompatible with a significant governmental interest. *Id.*, 589-90.

The defendant concedes that no argument can be made that any identifiable group was systematically excluded, and defense counsel acknowledged that lowering the jury pool by twenty people when dealing with a total pool of sixty or seventy potential jurors would not diminish the randomness of the pool. The defendant has not established the requirements of demonstrating a *prima facie* violation of the fair cross-section requirement and is not entitled to relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we remand to the trial court for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE